M. E. RUDASILL v. J. Z. FALLS.

*Principal and Agent—Ratification—Issues.*

1. Where an agent exceeds his authority, his principal must either wholly ratify or wholly repudiate the transaction. He cannot ratify that portion of the contract which is beneficial to him, and repudiate the remainder.
2. The provisions of The Code are mandatory, that the controverted allegations in the pleadings should be submitted to the jury in the shape of issues.

This was a CIVIL ACTION tried before *MacRae, Judge,* and a jury at Spring Term, 1884, of CLEVELAND Superior Court.

The facts appear in the opinion.

There was a verdict and judgment for the plaintiff, and the defendant appealed.

*Messrs. W. J. Montgomery* and *Gidney & Webb* for the plaintiff.

*Messrs. Hoke & Hoke* and *R. McBrayer* for the defendant.

SMITH, C. J.  The plaintiff, the defendant, and one Green became co-sureties on a note by the firm of Jenkins, Homesley

& Oates, as principals, to A. V. Falls, in the sum of sixteen hundred dollars, the amount due on which, the said Green becoming insolvent, has been collected in equal parts out of the other sureties. The present action is to recover the moiety paid by the plaintiff from the defendant, upon an allegation that the latter has received from their principals property in value sufficient to discharge the entire debt.

The plaintiff testified that upon the failure of the co-partner, Jenkins, and the death of Oates, the management of the factory, for conducting the business of which the partnership had been formed, devolved upon Homesley, who, in an interview with the several sureties and one E. Black, expressed a desire to provide for his sureties and said he had the means of doing so, and if they did not get the property some one else would, but that he wished to continue running the factory. That the plaintiff and Green declined to enter into such an arrangement, and, therefore, it was agreed that the defendant, representing all the sureties, should go to the factory and take a bill of sale of the property for their indemnity to be appropriated to the debt.

That some few days after, the defendant, in answer to an inquiry as to what had been done, said to the plaintiff, "I have got a bill of sale for two thousand dollars worth of property, and it ought to pay a sixteen hundred dollar debt," adding that he and Black had leased the factory from Homesley, and were going to run it, and that the latter would appropriate the profits to the discharge of the debt due to Falls, the creditor.

That two months later the defendant, in reply to the plaintiff's question whether any part of the debt had been paid, said it had not, and if not paid soon, the defendant would sell the property and apply the proceeds to it. The plaintiff expressed the wish that this should be done as he did not want to lose.

That a month after this conversation, the factory was placed in the hands of a receiver, and Homesley turned out of possession.

That the defendant has since refused to refund the money paid by the plaintiff on the ground that he and Green declined to

enter into the arrangement made on behalf of all the sureties for the continuance of the operations of the factory under the lease.

The defendant exhibited in evidence two papers, bearing the same date and executed at the same time, in one of which, signed by Falls, Black & Co., it is certified that they have bought of Jenkins & Homesley, surviving partners, certain enumerated articles, being all the personal property belonging to the said surviving partners, for the consideration of $2,000, " to be paid as follows, to-wit : $200 to J. Z. Falls, the defendant, $800 to A. V. Falls, the creditor, and the balance to E. Black, on claims they hold against Jenkins, Homesley & Oates, and Jenkins & Homesley, surviving partners of Jenkins, Homesley & Oates, for cotton furnished them. This February 13th, 1879," and signed

FALLS, BLACK & CO.

The other writing is an agreement entered into at the same time, between Falls, Black & Co., of the first part, and Jenkins & Homesley, of the other part, wherein is recited the renting by the former, from the other party, of the factory for a year, and the employment of the latter as superintendents and managers, and the placing in their hands $600 in money and the stock of goods and mules, wagons, &c., to be used in conducting the business, and to be returned at the end of the time, with an agreement that no debts are to be made nor contracts entered into in the name of the lessees for money borrowed.

This agreement is signed,

FALLS, BLACK & CO.,<br>A. R. HOMESLEY,

Witness: S. C. HOMESLEY.            J. JENKINS.

The defendant's testimony in antagonism to that of the plaintiff, is in substance this : That the proposition made by Homesley was, that if Black, Green, the plaintiff and the defendant would form a company, he would turn over the factory to them, and it was then agreed that the defendant, as one of the proposed association, should go to the factory and there carry the arrangement

into effect, as was done in the execution of the said writings; that defendant showed them to the plaintiff and explained what had been done by him; that the plaintiff declined to become a party to the lease and the arrangements for running the factory, and repudiated it all; that the defendant never took any of the assigned property in possession, intending to wait until the agreement was signed by the plaintiff; that upon this decision of the plaintiff, Jenkins & Homesley were notified that the arrangement was annulled and could not be carried out as was originally intended; that the defendant did afterwards come into possession of two mules and a wagon, sent by Jenkins & Homesley in payment of cotton which had been advanced to and used by them.

The plaintiff's version of the transaction was sustained by Green, while that of the defendant was confirmed by Homesley.

The charge in general terms was, that if the plaintiff's testimony be accepted as a correct statement of what transpired, the verdict should be for him; while if that of the defendant was true, the verdict should be in his favor.

The instruction in this alternative form is unexceptionable as far as it goes. But there is an intermediate aspect of the case presented in the testimony, and perhaps warranted by it, which was not brought to the attention of the jury. The result does not necessarily depend upon the terms of the first arrangement, nor the extent of the authority conferred upon the defendant, as agent of his associate sureties.

Assuming the plaintiff's representation to be true and his memory of what occurred entirely accurate, his statement is not in accord with the understanding of Homesley, who made the proposal, and the latter may have refused to make the assignment at all, except upon the condition of a continuance of the factory operations. If then, the defendant could not effect the object of the agency under the prescribed limitations and exceeded them in what was done, the plaintiff had an election to ratify or repudiate what was done on behalf of all. This he was bound to do,

15

and he could not sever parts of a single agreement embraced and expressed in the two writings, so as to take advantage of that which was favorable without the whole being assumed. The agency being exceeded, he was not bound by what the agent did in the name and for the common benefit, but he was bound to take the arrangement in its entirety or not to recognize its obligations at all.

"The principal cannot of his own mere authority ratify a transaction in part and repudiate as to the rest," is the language of Mr. *Justice Story* in section 250 of his work on agency. "He must either adopt the whole or none."

Another recent author lays down the same doctrine thus: "A nullification must extend to the whole of a transaction." So well established is this principle, that if a party is treated as an agent in respect to one part of a transaction, the whole is thereby ratified. From this maxim results a rule of universal application that where a contract has been entered into by one man as agent of another, the person on whose behalf it has been made "*cannot take the benefit of it without bearing its burdens.* The contract must be performed in its integrity." *Ewell's Evans' Agency*, 70, (Ed. of 1879, p. 95.)

The rule rests upon sound reason and abundant authority. *Crawford* v. *Barkley*, 18 Ala., 270; *Hodnett* v. *Tatum*, 9 Ga., 270; *Bank* v. *Hanner*, 14 Mich., 208; *Coleman* v. *Itache*, 1 Oreg., 115.

The record, and these instructions asked, present this view of the case, and the defendant had a right to have them, or their equivalent, given for the guidance of the jury. The judge was mistaken in his hurried reading of the series of instructions asked, in supposing they were embodied in his charge.

Had they been given the result might have been different, but at least the charge ought to have presented the case in this aspect to the consideration of the jury, and there is error in his mistake to do so.

This record has a defect to which the attention of the profession has been more than once directed. There were no issues

submitted to the jury, as the statute positively requires as to all the controverted allegations in the pleadings material to the recovery or the defence. This is an inseparable incident to our present system of practice, which submits inquiries of fact to the jury, of law upon the findings by the jury to the judge, and the functions of each in trials are clearly marked and defined. It is enough that the statute is mandatory in its directness (*Code*, sections 395 and 396), but the rule commends itself as proper and salutary in its operation.

There is error in the record and there must be a new trial, to which end let this be certified to the Superior Court, and a *venire de novo* be there awarded.

*Venire de Novo.*